James A. SNYDER, Appellant,

v.

Bess SCHILL, Appellee.

No. 14461.

Court of Civil Appeals of Texas.

Houston.

Dec. 3, 1964.

Rehearing Denied March 18, 1965.

Collins, Moore & Putnam, Gene E. Putnam, Houston, for appellant.

Bernard & Bernard, Donald R. Bernard, Houston, for appellee.

BELL, Chief Justice.

Appellee was the surviving mother of Margelet F. Snyder, deceased. Mrs. Snyder, who prior to her alleged marriage to appellant was Margelet Fowle, was an assured under a group life insurance policy issued by Metropolitan Life Insurance Company. Appellant allegedly married the deceased March 12, 1960. The insurance policy provided that in the absence of a named beneficiary the proceeds would be paid to the surviving spouse of the deceased and if there was no surviving spouse to the parents or surviving parent. Appellant claimed the proceeds of the policy as the surviving husband. Appellee, asserting that

appellant was never legally married to deceased because he was at the time of the marriage ceremony between him and deceased legally married to another, claimed the proceeds.

Appellee filed suit against the insurance company. The insurance company filed a cross-action interpleading appellant. It tendered the amount of the policy, $6,000.00, into the registry of the court, prayed for attorney's fees and asked that it be discharged. On trial before the court without the intervention of a jury, the court rendered judgment discharging the insurance company with its attorney's fee; rendered judgment that appellant take nothing and that appellee recover the proceeds of the policy, less the attorney's fee.

The court filed its findings of fact and conclusions of law. It found these facts:

1. That appellant married Reta R. Knapp on February 1, 1958, in Geneva, Ohio.

2. That appellant attempted to consummate a ceremonial marriage to Margelet Fowle March 12, 1960.

3. That appellant admitted to Margelet, Bess Schill and Ruth Anson, at a time subsequent to his purported marriage to Margelet, that *he was still married to Reta R. Knapp.* That again after the death of Margelet on May 15, 1961, appellant admitted to Bess Schill and Ruth Anson that *he was still married to Reta R. Knapp and was not entitled to any of the estate of Margelet because he was not legally married to her.* (Emphasis ours)

4. James Snyder never denied his own admissions to his prior existing marriage.

5. Based upon the uncontroverted evidence of appellant's admissions against interest it was found that he was married to Reta R. Knapp when the marriage ceremony was performed between appellant and Margelet.

The court filed conclusions of law that these admissions were sufficient to over-

come the presumption of termination of such prior marriage arising from the subsequent attempted ceremonial marriage to Margelet. The existing valid marriage of appellant to Reta R. Knapp was a legal impediment which rendered his attempted marriage to Margelet wholly void.

Appellant contends there was no evidence to support the trial court's finding that he was still married to Reta R. Knapp when he attempted to marry Margelet. Also, he asserts such finding to be against the overwhelming weight and preponderance of the evidence.

■ Appellant is correct in his contention that where a person marries again, after having once been married, a presumption arises that the previous marriage had been dissolved at the time of the subsequent marriage and the burden is on the person attacking the validity of the subsequent marriage to overcome this presumption by proving the previous marriage had not been dissolved by annulment, divorce or the death of the previous spouse.

The question we have is whether appellee discharged that burden. We must review the evidence.

Appellant, for some reason, was not present at the trial of his case. This fact appears from the unchallenged statement contained in appellee's brief.

Mrs. Schill and Mrs. Anson were the only witnesses testifying though a part of appellant's deposition was introduced in evidence.

The portion of Mrs. Schill's testimony material to our inquiry, given in question and answer form, is as follows:

"Q. Did you ever discuss anything concerning the relationship between James A. Snyder and your daughter with James A. Snyder?

"A. * * * When they came to me and told me his wife had called her, my daugh-

ter, and told her, she says, 'You are not married.' "

Objection was made to this on the ground it was hearsay. The court did not specifically sustain the objection but did state the attorney was asking what conversation she had with Snyder. The above testimony was never stricken nor was request made to have it stricken. The witness then answered, "Oh, I see. Well, there was both of them. I talked to both of them. I talked to both of them at once." The court then told the witness not to state what the daughter said.

"Q. * * * My question is about when the two of them came to your house and discussed the matter with you. The judge would like to know what James A. Snyder told you at that time.

"A. He just said he thought he had been divorced, but he didn't know it didn't go through. That is one thing he said.

"Q. What else did he say?

"A. He said that he was going to take care of it right away and straighten it out.

"Q. * * * Did you talk to him again about this?

"A. Well, no, because she passed away and he came over and talked to me alone.

"Q. Well, what did he say at the time that he talked to you?

"A. Alone? He said that * * * He was sitting there talking and I said, 'James, you know you can't get Margaret's (Margelet's) insurance or anything because you are not legally married to her' and I says, 'you have not got a divorce,' and he said, 'I Know it.'

"Q. James A. Snyder said that he knew he was not legally married?

"A. He says, 'I know it.'

"Q. Mrs. Schill, will you state whether or not on the occasion * * * when you were in bed with a broken hip * * *

James A. Snyder mentioned the name Reta R. Knapp to you?

"A. Well, no, he didn't mention that name at that time.

"Q. At what time? When did he mention it to you?

"A. Well, he mentioned it when they came over and told me he was not divorced.

"Q. When was that?

"A. It was some time, I think in October * * *

"Q. Of the year before she passed away?

"A. Yes.

"Q. And he mentioned that name as being the *name of the person he was still married to?* (Emphasis ours)

"A. Yes."

Mrs. Anson, the sister of the deceased, gave the following testimony:

"Q. Will you state to the Court on what occasion, that is, where, when, who was present, when you discussed this matter with James Snyder? (His relationship to deceased)

"A. Well, this was in my mother's home. I was visiting her on the weekend.

"Q. When was that?

"A. The latter part of October or the 1st of November, 1961. (1960)

"Q. * * * Will you state what you discussed with James Snyder at that time?

"A. Well, he discussed with us the fact that he was *not married legally to my sister, that he had a second wife* and was not divorced from her, and *it was a discussion between all of us.* (Emphasis ours)

"Q. Did you talk to James A. Snyder on any other occasions about his marital relationship with his former wife?

"A. Yes.

"Q. Will you state on what occasion you discussed this with him?

"A. This was after my sister's death, and he came to my mother's home. * * * and my mother mentioned to him * * * and I was standing right by him * * * that he should take care of this divorce business if he hadn't already done it."

There was evidence introduced from the District Clerk of Harris County that he had checked the Index Cards of his office covering the period from January 1, 1958 through May 30, 1962, and no divorce had been granted on a proceeding involving appellant and Reta R. Knapp. By deposition appellant had testified he was working in Harris County in 1959 and 1960.

In his deposition appellant denied that he had ever been married to anyone except Shirley Chambers, from whom he was divorced in about 1956 in Sullivan, Indiana. He had three children by her. He was not specifically asked about a marriage to Reta R. Knapp. He was asked about his marriage to a woman named "Frieda" and he denied such and said he did not know where that name came from. Apart from the admissions above set out, the marriage to Reta R. Knapp was sufficiently proven by a certified copy of the marriage certificate and admissions of fact made therein by appellant.

■ We think there was evidence of probative force to support the trial court's finding that appellant's marriage to Reta R. Knapp had not been dissolved at the time he purported to marry the deceased. We are also of the view that such finding is not contrary to the overwhelming weight and preponderance of the evidence.

■ There is, of course, a presumption that arises from the fact of a subsequent marriage that previous marriages have been dissolved. It is said to be one of the strongest presumptions known to law and that the presumption is itself evidence that may even outweigh positive evidence to the contrary. The strength of the presumption increases from the lapse of time, acknowledgment by the parties to the marriage, and the fact that the legitimacy of a child may be involved is a factor in sustaining the validity of the marriage. The presumption is grounded on public policy that favors morality, innocence, marriage, and legitimacy. Texas Employers Ins. Ass'n v. Elder, 155 Tex. 27, 282 S.W.2d 371.

■ The presumption, however, is not a conclusive one and may be overcome by evidence which standing alone negatives dissolution of the previous marriage. She is not required to prove absolutely or to a moral certainty that the previous marriage has been dissolved. Dockery v. Brown, Tex.Civ.App., 209 S.W.2d 801, no writ hist.

Appellant's position is that the only reasonable inference that can be drawn from the above testimony is that appellant had never procured a divorce from Reta R. Knapp. He says that it follows there is no evidence to support the trial court's finding that this marriage had not been dissolved because Reta could have procured a divorce or annulment and for all the evidence shows she could have been deceased when he married Margelet.

Appellee's position is that the above testimony does not merely show that appellant had never procured a divorce from Reta but it shows, because of appellant's admissions, that *he was still legally married to Reta* when he married Margelet, and that he recognized he needed to obtain a divorce. This admission, she says, established that the previous marriage had in no way been dissolved.

The effect of the above testimony is to show that someone, purporting to be the wife of appellant, called Margelet and told her that she (Margelet) and appellant *were not legally married*. Whether the person calling was actually Reta, we are not specifically informed. In the light of common experience, it would seem permissible to draw the inference that it was in fact Reta be-

cause who else would likely call about such a matter? On what the person who called based her statement we are not specifically informed because the court did not permit the conversation of Margelet with her mother to be completed though the evidence shows appellant was present, participating in the conversation and from what he said it appears he did not deny that his wife called and stated appellant and Margelet were not legally married. However, it is a matter of common knowledge that persons know that, apart from death, a marriage is dissolved only by divorce or annulment. It seems not to be an unreasonable inference that she was saying she had not procured a divorce or annulment. In this conversation appellant said he thought he had been divorced and didn't know it didn't go through and he would straighten it out. Considering the surrounding facts and circumstances appellant's statement amounted to much more than that he had not procured a divorce. Having at least heard from Margelet that his wife had called and told her that Margelet and appellant were not legally married, he, for reasons of his own, accepted such statement as true and merely explained he had thought a divorce had been procured. Then he said since it had not he would take care of it and straighten it out. Too, Mrs. Anson said in that same conversation appellant discussed " * * * the fact that he was not married legally to my sister, that he had a second wife and was not divorced from her * * *" This is more than evidence that he had not gotten a divorce from Reta because the discussion was a part of the conversation in which Margelet had said appellant's wife had called and said appellant and Margelet were not legally married. His speaking of the fact that he was not divorced was merely a recognition by appellant that Reta was still living, had not herself procured a dissolution of the marriage relationship and that he had not. Then, after Margelet's death, Mrs. Schill stated to appellant, in the light of this previous conversation, that

appellant could not get Margelet's insurance or anything *because he was not legally married to her* and he "had not got a divorce [meaning from Reta]." Appellant answered, "I know it." Then the leading question was asked, "James A. Snyder said he knew he *was not legally married?*" The witness answered, "He says, 'I Know it.'" Here again the inference may be drawn that he recognized he was still married to Reta and that it was necessary for him to procure a divorce from her. When all evidence is considered the inference is permissible that he was affirming that he was still married to Reta.

■ These were admissions by a party to the suit and the only party who could be adversely affected by the admissions. Generally, admissions made by a party to the suit that are inconsistent with the position being taken by him in the suit are admissible, not only for impeachment but also as substantive evidence on a material issue to which they may be relevant. McCormick & Ray, Texas Law of Evidence, 2d Ed., § 1121. This is true, as to the party to the suit making the admission, even though his admission may be based wholly on hearsay.

In the case of McNeely v. Southwestern Settlement and Development Corp. et al., Tex.Civ.App., 284 S.W.2d 167, no writ hist., the trial court had instructed a verdict against McNeely on his claim of adverse possession because it concluded McNeely's admission of unopposed possession by persons claiming under the record owner destroyed the adverseness of his possession. The facts had merely been told McNeely by his wife but he testified to them as facts. The contention that the testimony was purely hearsay was overruled. The court said:

"George McNeely seems to have been out of the county at the time of the intruding use * * * so could not have had personal knowledge of this

use; but he is a party to the suit and his testimony * * * was an admission and admissible as such, to prove the truth of the facts related by him, because of the inconsistency between his testimony and the position he takes as a claimant by adverse possession; and it was not necessary that he have personal knowledge of the facts he testified to, * * *"

In McCormick and Ray, Texas Law of Evidence, 2d Ed., § 1125, the rule is stated thus:

"In general it may be said that admissions are not subject to the rules of testimonial qualifications. In particular, personal knowledge. * * * is not required in respect to admissions. Thus if party makes a statement as a matter of fact, it is admissible against him, although his knowledge is based entirely on hearsay."

See also Wigmore on Evidence, 3rd Ed., § 1053.

■ The fact that the admission made by a party is a conclusion or opinion does not prevent its use. McCormick and Ray, Texas Law of Evidence, 2d Ed., § 1126, and Wigmore on Evidence, 3rd Ed., § 1053.

■ As we observed earlier, the presumption of the dissolution of a prior marriage is itself evidence. It is stronger when the lapse of time between the two marriages has been long and where legitimacy of children is involved. Here only a little less than three years had elapsed between the two marriages. There is no question of legitimacy of children involved, because there is no evidence of children of the subsequent marriage. We have here no question of a continuance of the second marriage because the innocent party to it is dead. The basic reasons for the policy are, therefore, absent. The only party whose rights are affected by giving effect to the admissions of appellant is appellant himself and he is no innocent party.

Under the facts of this case, we feel appellee discharged her burden.

The judgment of the trial court is affirmed.